UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

CHRISTINA MARGARET PORTER, Deceased, )
by Brent M. Porter and Mary M. Salstrom, as )
Administrators of her Estate, and individually, )
)
                   Plaintiffs, )
)
                v. )   Civil No. 07-cv-28-PB
)
DARTMOUTH COLLEGE et al., )
)
                  Defendants. )

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S SUMMARY JUDGMENT MOTION
BASED ON LIABILITY RELEASE**

## I.   INTRODUCTION

Christina Margaret Porter, a Dartmouth College sophomore, suffered catastrophic and ultimately fatal brain and bodily injuries while taking the College's physical education program downhill Ski Class.

The Court is familiar with this ensuing wrongful death action, having denied Dartmouth's motion to dismiss and ruling that the New Hampshire ski operator statute *does not bar plaintiffs' negligent ski instruction claims. Porter ex rel. Porter v. Dartmouth College*, 2007 WL 3124623 (D.N.H. Oct. 24, 2007), 2007 DNH 131.

Dartmouth now contends it is entitled to summary judgment because Ms. Porter purportedly released the College from all liability before taking the Ski Class. Not so.

The release at issue is an *equipment rental agreement with **Salomon***, the manufacturer of the bindings attached to the students' skis and boots. Exhibit A1.[1] All students who rented ski equipment for the Ski Class, including Ms. Porter, were required to sign this document. The document was a pre-printed form which included a liability release only for injuries resulting from *use of the **equipment** in **recreational** snow sports*. By its very terms, the release *does NOT apply* to injuries occurring during a *physical education ski class* furnished by an educational institution such as Dartmouth.

Moreover, ***Dartmouth was not a party*** to the release agreement, nor an intended beneficiary. ***Dartmouth's name appears nowhere*** on the form, unlike the liability waiver forms Dartmouth requires students to sign to participate in other physical education classes, which explicitly release Dartmouth by name.[2]

Even if an exculpatory release of defendant were somehow construed to exist, it would be *unenforceable*. Crucially, there is no showing that by signing the Salomon form, Ms. Porter contemplated that she was releasing Dartmouth from liability *for injuries occurring in the Ski Class* when she signed the Salomon form relating to ski equipment.

Defendant's motion must be denied.

## II.  STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

1. Dartmouth's name does not appear on the Salomon release form. A1.

---

[1] All documents in support of this Opposition Memorandum are attached as exhibits to the accompanying Declaration of Charles J. Raubicheck, one of plaintiffs' attorneys of record. Because of the importance of this exhibit, it is appended hereto.

[2] Tellingly, Dartmouth *did not submit the release agreement* at issue in its moving papers.

2.  In January 2004, Dartmouth offered a downhill Ski Class, called the "Physical Education Alpine Program," to its students. Raubicheck Decl., Ex. 1 at 22. To obtain physical education credit for the Ski Class, a student was required to attend six two-hour sessions at the Dartmouth Skiway, a ski area located approximately ten miles distant from the college. Ex. 2, Dartmouth Alpine Program Welcome flyer, pp. 2-3. At the time of registration, the costs of bus transportation and lift passes were charged to each student's college bill. Ex. 2, p. 1. Dartmouth assessed attendance by having students present their bus passes to a student instructor following each session. Ex. 2 at pp. 2-3; Ex. 3 (K. McClintock Dep. Tr. at 76). If the student completed the session, the instructor would mark the pass. *Id.*

3.  Ms. Porter rented her ski equipment for the Ski Class, and signed the Salomon form at Leverone Field House, an athletic facility on Dartmouth's campus for track, football, lacrosse, soccer, softball, golf and rugby. Ex. 2, p. 1. Other Dartmouth students were present to make sure that each renter of the equipment signed the Salomon form. Ex. 3 at p. 207. There was no provision for the students to "opt-out" of signing the Salomon form. Every student renting the equipment signed the form. Ex. 4, Def's. Resp. to Pls.' Interrog. at 9.

4.  Dartmouth retained responsibility for its students' safety in the Ski Class. The 2006 Instructor's Manual for Dartmouth's Office of Physical Education required that *"[f]or all accidents, minor and major, an accident report* must be completed in as much detail as possible and turned into the *Physical Education Office"*. Ex. 5 at D1764 (emphasis supplied). The Manual provided that minor injuries would be treated on campus. *Id.* In the event of any injury, the Physical Education Office was to be directly involved. *Id.*

5.  Dartmouth has secured waivers from its students in other physical education classes -- back-country skiing, rope-climbing, and a certification in "top-rope." These other

3

waivers contained the following language expressly releasing Dartmouth from liability:

    (a)  **Back-Country Skiing Waiver**

> "I further agree, on behalf of myself, and my heirs and assigns, to release and hold harmless ***Dartmouth College***, its officers and agents, employees, successors and assigns from any and all claims and causes of action arising out of my participation in this activity except insofar as such claim or cause of action arises from the actual negligence or intentional acts by ***Dartmouth College***, its officer, agents or employees.

Ex. 6, emphasis supplied.

    (b)  **Ropes-Course Waiver**

> "In recognition of and in exchange for permitting me to participate in this activity, I agree, on behalf of myself, and my heirs and assigns, to release and hold harmless ***Dartmouth College***, its officers and agents, employees, successors and assigns from and against any and all claims and causes of action arising out of my participation in this activity, including any claim or cause of action arising from the actual negligence or intentional acts by ***Dartmouth College***, its officers, agents or employees.

Ex. 7, emphasis supplied.

    (c)  **Top-rope Certification Waiver**

> "In recognition of and in exhange for permitting me to participate in this activity, I agree, on behalf of myself, and my heirs and assigns, to release and hold harmless ***Dartmouth College***, its officers and agents, employees, successors and assigns from and against any and all claims and causes of action arising out of my participation in this activity, including any claim or cause of action arising from the actual negligence or intentional acts by ***Dartmouth College***, its officers, agents or employees.

Ex. 8, emphasis supplied.

There is a glaring contrast between the Salomon form, which is explicitly and exclusively directed to use of *equipment*, and these Dartmouth waivers for other sports, which are explicitly and exclusively directed to a student's *participation* in an athletic *activity*.

4

### III. STATEMENT OF DISPUTED MATERIAL FACTS

1. Dartmouth was not a party to the Salomon release agreement. A1.

2. The only parties to the release agreement were Salomon and the person signing the agreement. *Id.*

3. Dartmouth is not a PROVIDER as defined in the Salomon release. *Id.*

4. Dartmouth is not an intended beneficiary of the Salomon release. *Id.*

5. Dartmouth is not entitled to enforce the Salomon release. *Id.*

6. As evidenced by its title and provisions -- EQUIPMENT RENTAL & LIABILITY RELEASE AGREEMENT -- the Salomon document is a release solely for (a) the ski equipment rented, and (b) use of that equipment in RECREATIONAL SNOW SPORTS. *Id.*

7. The Salomon release does not release Dartmouth, or any other person or entity, from liability for injuries arising from injuries occurring in a physical education ski class. *Id.*

8. The Salomon release does not release Dartmouth, or any other person or entity, from liability arising from injuries to Dartmouth students occurring in Dartmouth's Ski Class. *Id.*

### IV. ARGUMENT

#### A. The Summary Judgment Standard

Dartmouth carries a weighty burden on its motion. To grant summary judgment in Dartmouth's favor, the Court must find that no genuine issue of material fact exists to be tried. *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 12 (1st Cir. 1994). The Court must scrutinize the entire record in the light most favorable to the plaintiffs, with all inferences presumed in

plaintiffs' favor. *Orr v. Goodman*, 157 N.H. 511, 513 (2008); *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 259 (1st Cir. 1994).

### B. The Salomon Release Does Not Shield Dartmouth from Liability

As a general rule, under well-established contract law, only a party to a contract may enforce its terms. "The promisor and promisee are the 'parties' to the agreement." *Restatement (Second) of Contracts* § 2g (1981). Ex. 9.

Here, the parties to the release agreement are Salomon, the manufacturer of the equipment rented, and the person renting the equipment. Salomon is not a party to this action, and is not seeking to enforce the release. Dartmouth, the entity attempting to invoke the Salomon release, is quite clearly *not a party* thereto.

The only other person or entity who may be able to enforce a contract is an "intended third party beneficiary." *Id.* at § 302a. "A benefit to a third party is a 'motivating cause' of entering into a contract only where the promisee intends 'to give the beneficiary the benefit of the promised performance.'" *Id.* at § 302(1)(b). "Unless the performance required by the contract will directly benefit the would-be intended beneficiary, he is at best an incidental beneficiary.'" *Grossman v. Murray*, 144 N.H. 345, 348 (1999), quoting *Public Service Co. of N.H. v. Hudson Light & Power*, 938 F.2d 338, 342 (1st Cir. 1991). An incidental beneficiary has no rights whatsoever under a contract. *Restatement (Second) of Contracts* at § 302.

The contract must be *crystal clear* that an enforceable benefit is being conferred on a third party. Solely where "the contract is so expressed as to give the promisor *reason to know* that a benefit to a third party is contemplated by the promisee as one of the motivating causes of his making the contract" is an enforceable right is established. *Grossman* 144 N.H. at 347,

(emphasis supplied); *Arlington Trust Co. v. Estate of Wood*, 123 N.H. 765, 767-768 (N.H. 1983).

Critically, the third party "must show with ***special clarity*** that the contracting parties intended to confer a benefit on him." *McCarthy v. Azure*, 22 F.3d 351, 362 (1st Cir. 1994) (refusing to interpret contract to include agents as third party beneficiaries where neither the company nor the employee are explicitly mentioned) (emphasis supplied). That special clarity must come from the contract document itself. *See McCarthy*, 22 F.3d at 355. Failure to show specific intent to benefit means that the third party is nothing more than an incidental beneficiary and not entitled to enforce the contract.

Dartmouth has failed to make the requisite showing that the motivating cause of Salomon's release was to benefit Dartmouth directly. The law requires that a court carefully review the terms of any waiver. "To determine the scope of the Release, we examine its language." *Dean v. McDonald, d/b/a Lee USA Speedway*, 147 N.H. 263, 267 (N.H. 2001). The language of the Salomon form is utterly lacking -- with any special clarity or otherwise -- that Salomon and Ms. Porter intended for Dartmouth to be released.

Dartmouth is reduced to saying that it is among the PROVIDERS mentioned on the form (the equipment rental facility, its employees, owners, affiliates, agents, officers, directors, and the equipment manufacturers and distributors and their successors in interest"). Defendant can only muster that "there is no dispute that Dartmouth College and its employees" fall within this ambiguous term. Def's. Mem. at 11-12.

***But there most certainly is a dispute***. In the absence of its name appearing anywhere in the document, the "Provider" Dartmouth would call itself is "equipment rental facility" and its "employees." *Id.* However, Dartmouth did not rent the equipment to members of the public. It provided the equipment to its students at Leverone Field House, *an athletics building* on the

Dartmouth campus, to take the college's physical education Ski Class. Ex. 2 at p. 1. Nothing in the Salomon form states or implies that the equipment rental facility term extends to an educational institution or its on-campus sports facility.

Further, the language Salomon chose to use in its release form expressly limits the scope to the *recreational context -- not an educational or instructional one*. The form uses the words **RECREATIONAL SNOW SPORTS** -- in capital letters -- *four times*. Recreation is "a means of refreshment or diversion: HOBBY." *Webster's Dictionary, Tenth Edition* (2002), at 975. Ex. 10. The obvious import: Salomon devised this form and intended it to be used at public ski areas, not in schools.

Significantly, when Dartmouth wants to immunize itself from liability for particular physical education courses, it knows how to do so. Dartmouth has waivers for its back-country skiing, ropes, and top-rope certification, which all spell out *clearly and unambiguously* that participating students release Dartmouth College from liability. Exs. 6-8, *supra*; Ex. 4 at 9. Notably, Dartmouth requires an explicit release for back-country skiing. Ex. 6. In those documents, unlike the release here, there is no vague mention of facilities.

Dartmouth -- neither a party nor an intended beneficiary -- cannot shoehorn the Salomon form into an applicable release to escape liability for plaintiffs' negligence and wrongful death claims.

C. **Even if there were a Release, it is Unenforceable**

In New Hampshire, exculpatory contracts are generally prohibited. *Dean*, 147 N.H. at 266-267; *Barnes v. New Hampshire Karting Ass'n*, 128 N.H. 102, 106-107 (N.H. 1986). An exculpatory contract, such as a release from liability, will only be enforced if: (i) it is not against

public policy; (ii) the plaintiff understood the import of the agreement or a reasonable person in his position would have understood its import; and (iii) the plaintiff's claims were within the contemplation of the parties when they executed the contract. *Id.*; *Audley v. Melton*, 138 N.H. 416, 417-418 (N.H. 1994.) *All three* of these elements must be satisfied.

An exculpatory contract is strictly construed against the defendant. *Dean*, 147 N.H. at 267. The release must "clearly and specifically" indicate the intent to release the defendant from personal injury caused by the defendant's negligence." *Id.*

Under these standards, Dartmouth fails to carry its burden.

### 1.   Ms. Porter Did Not Clearly and Specifically Intend or Contemplate Releasing Dartmouth for Injuries in the Ski Class

As emphasized by the controlling authority above, clear and specific intent to release *the defendant* from liability must be shown.

It is impossible for Dartmouth to show this.

- The release is a *Salomon form*, with this binding manufacturer's name and logo printed prominently at the top.

- ***Dartmouth's name does not appear anywhere*** on the document.

- The release ***does not mention the Dartmouth Ski Class*** in which Ms. Porter was enrolling, or ski instruction generally.

- Ms. Porter is *deceased,* so she cannot testify about her intent or what she contemplated.

*Audley v. Melton* is especially apt. Plaintiff, a professional model, was bitten on the head by an adult lion during a photography shoot at defendant's studio. The release excused injuries inflicted by wild animals, but it failed to specifically name the defendant as not liable from the

9

consequences of his own negligence. 138 N.H. at 418-19. 'The release fails in this respect not because it neglects to use the word 'negligence' or any other special terms; instead it fails because no *particular* attention is called to the notion of releasing the defendant from liability for his own negligence. The general language in the context of the release simply did not put the plaintiff on clear notice of such intent." *Id.* (emphasis by the court).

### 2. Neither Ms. Porter, Nor a Reasonable Person in her Position, would have Understood the Import of the Release As Exculpating Dartmouth

Furthermore, neither Ms. Porter, nor any reasonable person presented with the Salomon form, would have thought that the release went *beyond* the ski equipment to immunize *Dartmouth* from potential liability for injuries that might occur in the Ski Class. The release came from Salomon, a ski binding manufacturer. Ms. Porter and the other students taking the Class were renting boots, poles and skis and Salomon bindings, and Dartmouth's name was nowhere to be seen. It was an *equipment rental release* form *from a company*, as it straightforwardly said in its title.

Dartmouth's contention that it is an "equipment rental facility" on the Salomon form strains credulity. Defendant presents no facts demonstrating that Ms. Porter or other students taking the Ski Class understood the college to be such a facility. Indeed, how could they? They rented their equipment at a field house on campus, which does not function or operate as such a place. Viewing all inferences in plaintiffs' favor, Ms. Porter and other reasonable students would clearly not have understood "equipment rental facility" to refer to mean the Leverone building. When any ambiguity exists, a release will not be enforced. *Audley*, 138 N.H at 418-419. *See also Ghionis v. Deer Valley Resort Co., Ltd.*, 839 F. Supp. 789, 793-94 (D. Utah 1993) (denying summary judgment based on ambiguity in the release).

Also, there is no any specific language in the Salomon release form about physical education skiing. There are 25 lines in the release portion of the Salomon form. In those lines, the word "equipment" appears *13 times*. App 1. In contrast, the Salomon form never speaks of ski teaching – the heart of plaintiffs' claims in this case. Yet the students were renting the equipment to learn how to ski. No reasonable student, including Ms. Porter, would have construed the release as extending to possible negligent acts of Dartmouth in the Ski Class.

Dartmouth's reliance on *Checket v. The Tuthill Corp. d/b/a Blue Mountain Ski Area*, No. 99-1819, *8 (Pa. Mar. 2, 2001) and *Lee v. Camelback Ski Corp. a/k/a Camelback Ski Area*, No. 8324, at *3 (Pa. Apr. 15, 2001) is misplaced. These cases involved waivers the plaintiffs signed when they showed up to ski *recreationally*. Neither have anything do with claims by students related to negligence in a ski class. In fact, in *Checket*, the court observed that "the activity [engaged in] is *purely recreational*, and not essential to Checket's personal or economic well-being." Quarles Aff., Ex. F at 7 (emphasis added).

In addition, unlike here, the plaintiff was aware exactly who was being released. In *Checket*, the name *Blue Mountain Ski Area* under which defendant did business appeared on the face of the release. Quarles Aff., Ex. F at 10. Similarly, the plaintiff in *Lee* signed a document entitled *Camelback* Rental Agreement and Release of Liability, and defendant did business as Camelback Ski Area. *Id.* Quarles Aff., Ex. G at 1.

### 3. The Instant Release Contravenes Public Policy

Finally, Dartmouth must also demonstrate that the Salomon agreement does not conflict with public policy. As defendant acknowledges, a release is against public policy where (i) a "special relationship" exists between the promisor and promisee, and (ii) there is substantial disparity in bargaining power between the parties. *Audley,* 138 N.H. at 416, 418; *Barnes,* 128

11

N.H. at 106-107. "An agreement is against public policy if, among other things, it is injurious to the interests of the public, violates some public statute, or tends to interfere with the public welfare or safety. *Harper v. Healthsource New Hampshire*, 140 N.H. 770, 775 (N.H. 1996).

### a. New Hampshire has a Public Policy for the Safety of Students in Physical Education Classes

The Department of Education in New Hampshire releases guidelines to educators in the state detailing how to properly assess the students taking physical education classes from kindergarten to 12th grade. *See, e.g.*, New Hampshire Physical Education K-12 Assessment, Ex. 11. The purpose is to provide an overall vision for how physical education is to be taught to students in New Hampshire. *Id.* at iii.

Of particular significance here, New Hampshire in these guidelines recognizes that physical education must be both "regular" and "safe" to be effective. *Id.* at v. "Within a *safe*, structured environment, students develop motor skills, identify movement concepts and achieve and maintain a health-enhancing level of physical fitness." *Id.* (emphasis supplied).

Dartmouth's failure to follow safe practices in its Ski Class led directly to Ms. Porter's injuries. As plaintiffs' skiing accident expert Stanley Gale notes in his report in this case:

- "At turns such as these [on Bypass], the ski instructors traditionally lead their students in a designed path and customarily use a series of maneuvers. This specific ski instruction is designed to appreciate, understand, use and *safely* negotiate the ski slope." Ex. 12, Gale 7/1/09 Report at 8. The instructors abandoned Ms. Porter and the other students. *Id.*

- The PSIA Stepping Stones approach which the [Dartmouth] student instructors never saw, is "customarily utilized for teaching the acquisition of developmental skiing skills in a *safe*, prudent and demonstrable manner." *Id.* at 9. The PSIA Alpine Manual teaches ski instructors how to "handle a class in a *safe* and responsible manner." *Id.* at 11. Mr. Weiss testifies that he never saw these materials. *Id.* at 9. Mr. McClintock, director of the Program, did not know what Stepping Stones were when asked at his deposition. *Id.*

- "Mr. McClintock missed a vital opportunity to actually assess and monitor the quality and *safety* assurance of his instructors." *Id.* at 13.

Dartmouth contends that public policy is not an issue because the Supreme Court of New Hampshire has indicated that skiing is not a service of importance to the state. Def's. Mem. at 7. But the *safety of students in physical education skiing* clearly is. The above-noted guidelines New Hampshire has issued straightforwardly demonstrate the State's interest in the safety of students taking ski classes in schools.

There is no substantive distinction between the safety of an 18-year old in twelfth grade and a 20-year old college student such as Ms. Porter. Indeed, the Supreme Court of New Hampshire has recognized that colleges have a *special duty of care* to their students. *See Schneider v. Plymouth State College*, 144 N.H. 458, 463 (N.H. 1999). "When the plaintiff enrolled at PSC, she became dependent on the defendants [the college] for her education, thereby requiring them 'to act in good faith and with due regard' for her interests." *Id.* College students are vulnerable; no longer children, but not quite adults.

The release at issue would interfere with public policy. Dartmouth cannot be allowed to rely on this exculpatory contract to absolve it from its failure to follow physical education safety guidelines mandated throughout the State.

**b.   A Special Relationship Exists Between Dartmouth and Students in its Ski Class**

As Dartmouth acknowledges, New Hampshire law recognizes that a special relationship arises from a duty of public service. Def's. Mem. at 7. Such a party cannot "contract out" of

13

potential negligence claims. *Shaer Shoe Corp., v. Granite State Alarm, Inc.*, 110 N.H. 132, 134 (New Hampshire "holds invalid contracts exempting a person from liability for the consequence of his own negligence"). Certain commonly-recognized classes of persons charged with that duty include common carriers, innkeepers or public utilities. *Tanguay v. Marston*, 127 N.H. 572, 577 (N.H. 1986). The recognition of these special relationships derives from the expectation of the public to safe treatment and the importance of the activity offered. *See, e.g., Wagenblast v. Odessa School District*, 110 Wash.2d 845, 848-50 (Wash. 1988).

But the above examples are not exhaustive. As Dartmouth acknowledges, a special relationship extends to those "***otherwise charged*** with a public service." *Barnes*, 128 N.H. at 108; Def's Mem. at 7 (emphasis supplied). Whether such a relationship exists is made on a case-by-case basis. *Tanguay v. Marston,* 127 N.H. 572, 577-578 (N.H.1986) ("***such as*** landlord-tenant or common carrier-passenger") (emphasis supplied); "The fact that a ski area is available for public use is ***not dispositive of the special relationship*.**" *McGrath v. SNH Development, Inc. et al.*, 969 A.2d 392, 397 (N.H. 2009).

Dartmouth, in offering its ski class, had a special relationship with its Ski Class students, including Ms. Porter. She was not just any member of the public showing up to ski on the slopes of the Dartmouth Skiway. Ms. Porter had signed up for a class in Dartmouth's physical education program. She had the expectation that she would be taught how to ski. This relationship is plainly part of the special duty of care the Supreme Court of New Hampshire has already recognized exists between college and student. *See Schneider,* 144 N.H. at 463.

New Hampshire is not alone is recognizing this duty. Federal and state courts in other jurisdictions have recognized just such a special relationship between a college and its students in the athletic context. *See, e.g., Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1375 (3rd

Cir. 1993) (reversing grant summary judgment and holding college owes special duty of care to students on intercollegiate team); *Davidson v. University of North Carolina*, 543 S.E.2d 920, 927 (N.C. 2001) (reversing denial of claim of injured university cheerleader because of special control exerted by college over program); *Kyriazis v. University of W. Virginia*, 450 S.E.2d 649, 655 (W. Va. 1994) (upholding negligence claim of student injured in rugby play because university was "fulfilling its educational mission and perform[ing] a public service").

Dartmouth's reliance on *McGrath* and *Barnes* is of no avail. Defendant focuses on *McGrath*, 969 A.2d 392, where the Supreme Court of New Hampshire affirmed the enforcement of liability release agreements against members of the public using season passes for snowmobiling at a resort. Defs. Mem. at 6-8. Analogizing snowboarding to the kart racing at issue in *Barnes*, the court in *McGrath* observed that "we cannot say that the ***recreational*** activity of snowboarding is of such great importance or necessity to the public that it creates a special relationship between the ski area and the plaintiff." *McGrath*, 969 A.2d at 397 (emphasis supplied).

Once again, these examples miss the mark. The ***downhill skiing instruction*** imparted to Ms. Porter in Dartmouth Ski Class is a far cry from recreational kart racing or snowboarding.[3]

c.  **A Disparity in Bargaining Power Existed Between Dartmouth and Ms. Porter**

A "disparity in bargaining power can arise from the generality of use of contracts insisting upon assumption of risk by all those engaged in such a field, so that the plaintiff has no alternative possibility of obtaining the service without the clause." *McGrath*, 969 A.2d at 397.

---

[3] Notably, the New Hampshire legislature distinguishes between those statutes governing "Education," *see* Title XV, chapters 186-200, and "Public Recreation," see Title XIX chapter 225-A. In law of the case, this Court has already held that the Public Recreation statutes do not bar plaintiffs' claims. Porter, 2007 WL 3124623, 2007 DNH 131.

15

Here, the Salomon form was a general release. The language could not be negotiated. To participate in the Ski Class, Ms. Porter had to sign it. There was no alternative possibility for her to obtain ski instruction at Dartmouth with rental skis without signing this form.

## V. CONCLUSION

This appears to be a case of first impression. Based on published case law, never before has a New Hampshire college attempted to enforce a waiver against its own student who suffered injuries and death in one of its physical education classes. Instead, the Court is treated to a series of inapposite cases affirming a resort or amusement park's right to immunize itself against claims by its patrons.

For the foregoing reasons, defendant's motion for summary judgment based on the Salomon release should be denied in all respects.

Dated:   June 1, 2009                                 CLAUSON, ATWOOD & SPANEAS

                                                      By: /s/ K. William Clauson
                                                          K. William Clauson
                                                          10 Buck Road
                                                          Hanover, New Hampshire 03755
                                                          (603) 643-2102

                                                      Attorneys for Plaintiffs

Of Counsel:

FROMMER LAWRENCE AND HAUG LLP
Charles J. Raubicheck
Kevin Murphy
745 Fifth Avenue
New York, New York 10151
(212) 588-0800